**CITY OF BEAUMONT, et al., Appellants,**

v.

**Woodford D. BOUILLION,
et al., Appellees.**

No. 09–91–159 CV.

Court of Appeals of Texas,
Beaumont.

May 6, 1993.

Lane Nichols, City of Beaumont, Dewey Gonsoulin, Robert Black, Mehaffy & Weber, Beaumont, for appellants.

Ted G. Walker, Jasper, George M. Kirk, Jr., Tom Coleman, Jr., Coleman, Bartlett and Associates, Houston, for appellees.

Before EVANS [1], Acting C.J., and BROOKSHIRE and BURGESS, JJ.

---

1. The Honorable Frank G. Evans, Chief Justice, Retired, Houston [1st Dist.] Court of Appeals, sitting by assignment pursuant to TEX.GOV'T CODE ANN. § 74.003(b) (Vernon 1988).

## OPINION

PER CURIAM.

This is an appeal by the City of Beaumont from a lawsuit initially instituted by five plaintiffs, four of whom are former police officers and one who was active in the Beaumont Police Department at trial date. These five officers had certain rank. They sought actual and exemplary damages as well as relief under a declaratory judgment proceeding. Equitable relief by way of injunction was also sought. The trial was to a jury.

Four of the plaintiffs below, three Majors and one Captain, aver that they were wrongfully, constructively discharged by one Albert E. Haines, a former city manager of the city of Beaumont. Their discharge, the ranking officers pleaded, was in retaliation for reporting a violation of the law. The violation reported implicated the City Charter. TEX. REV.CIV.STAT.ANN. art. 6252–16a, popularly known as the Texas Whistleblower Act, was invoked. These officers had, they contended, advocated and expressed themselves in one way or another for the enforcement of a certain local hiring preference ordinance which was contained in the Charter of the City of Beaumont. The majors and the captain allege that their constitutional rights of free speech and of assembly were violated.

The fifth plaintiff, an officer who was still active in the police department, Woodford D. Bouillion, complained that he was unjustly demoted from the rank of major to the rank of captain in retaliation for his advocacy of the enforcement of the City Charter and because of certain other acts.

The defendants below were: the City of Beaumont, a former mayor, the former city manager, and the present city manager in their official capacities. The former city manager was also sued individually as well as in his former official capacity.

The juried proceeding was tried twice. In the first trial, the jury reached an impassable deadlock. There was a second jury trial conducted in January of 1991. The jury verdict favored the plaintiffs; thereafter, the judgment was entered in favor of the plaintiffs and against the defendants. The date of the judgment was March 19, 1991. The appeal is timely.

### Background

The record reflects a strain of evidence that the former city manager employed managerial techniques that were different and to some, devastating. Under the City Charter, the city manager had the capacity and power to act as the chief administrator and executive officer of the city. The city manager had the power and duty to appoint and to remove the heads of the different departments. This power, however, was definitely delineated and limited by the City Charter. The Charter mandated that the power given be limited in that the citizens of Beaumont shall be given preference in employment by the city. Well settled is the concept that the verb "shall" is mandatory.

The then city manager initially employed a non-Beaumonter in a newly created position as "resource manager" who, in effect, acted as an assistant city manager. This was an important, powerful position. It was not shown that a resident citizen of Beaumont was considered initially as a candidate.

Article XVII, § 7 of the City Charter of Beaumont reads:

Section 7—**CITIZENS GIVEN PREFERENCE IN EMPLOYMENT:** Except as herein otherwise provided, qualifications being equal, citizens of Beaumont shall be given preference in employment by the City as well as by any contractor doing work for the City under contract, and such contractors shall pay the prevailing rate of wages paid for the class of work done; and qualifications, prices and quality of material being equal, citizens of Beaumont shall be given preference in the awarding of all contracts over which the City has jurisdiction, provided that this section shall not interfere with the system of purchasing supplies for the various departments by competitive bidding.

Next, the city manager hired another non-resident of Beaumont as the executive officer of the City Insurance Department. These appointments resulted in two positions being filled by citizens of an out-of-state city. A personnel director was hired who was a citi-

zen of a central Texas municipality. Note then that the resource manager, who had certain duties as an assistant city manager, the head of the insurance department, and the head of the personnel office were all non-citizens of Beaumont. The police officers observed these occurrences.

The office of the Chief of Police became vacant. The appellees were long time resident citizens of Beaumont. The record demonstrates that these appellees had devoted their working lives to being career police officers. Their combined experience totalled many years. Over decades the appellees had earned elevation in rank by competitive examination through the ranks of lieutenant, captain and major, except one appellee who had attained the rank of captain. Upon the resignation of the Chief of Police John Swan, a vacancy in this important police post occurred. Several police officers who were long time resident citizens of Beaumont applied for this position. In an unexpected action, the resource manager, Mr. Max Patterson, was appointed as interim police chief. This appointment as interim police chief occurred in early December 1986, following a meeting attended by former city manager Haines, one Ray Riley, and Max Patterson. Mr. Riley objected, recommending appellee Cecil Rush for this position. But the appointment was immediately made favoring Mr. Patterson. We observe the Charter has no proviso that excepts acting or interim employment from its breadth.

At this point in time, the interim police chief began a tenure acting as the Chief of Police. He required that no police officer communicate with persons in the city hall. More importantly, Mr. Patterson began reshaping and restructuring in a fundamental way the police department. The basic organization of the department was changed. Police personnel were reassigned. The divisions were realigned. Efforts were made to thoroughly reorganize the police department, having a permanent effect. The interim chief operated as a permanent chief would. The jury was entitled to evaluate the actions and processes of Mr. Patterson as interim chief. The jury was also entitled to weigh from his actions and the actions and conduct of the then city manager that Mr. Patterson would probably be made the permanent Chief of Police.

An indicia of the permanency of the appointment was revealed with the ordering of a compilation of names of the injured policemen or those who were old and ill for the purpose of definitely terminating their connection with the department. The record reveals other acts of disassembling the structure of the department by the interim appointee. A pragmatic perception came into being that Mr. Patterson was initiating certain structural modifications, which in turn had the arbitrary effect of eliminating potential candidates for the position of chief. Despite the title of the new head of police, the actions taken were permanent and sweeping in nature. The evidence demonstrated that this appointee was uncertified.

The appellees contended that they observed and were cognizant of a certain advertisement for a police chief for Beaumont, which was published in a nationally recognized police magazine. This publication set out as qualifications certain backgrounds and characteristics. Appellees contended that this advertisement had been prepared by Mr. Patterson. The qualifications for chief had been diminished. The appellees then determined that Mr. Patterson was in practical effect the Police Chief of the City of Beaumont and was proceeding as permanent chief. The jury was entitled to draw logical conclusions and inferences from this body of evidence.

Appellees vigorously assert that the interim appointment of the Chief of Police was a mere pretext in order to allow the interim chief to become a citizen of Beaumont. Appellees argue that the violation had been brought about by failing to give citizens of Beaumont a preference in employment. Some probative evidence exists that the interim appointee was not qualified in view of certain problems he had experienced in a distant state. He had personnel problems and difficulties with a union. The president of the Beaumont Policemen's Union had completed an investigation into these matters.

Twenty-one staff officers then signed a press release and held a press conference in

mid-January 1987. The conference publicized the initial potential violations of the Charter by the former city manager. The purpose of the release was to inform the citizens of Beaumont of the appellees' opinions regarding the potential violations and the selection of a chief despite the Charter. In these actions the appellees insist that they were exercising their constitutional rights of free speech and assembly in order to report an impending violation.

Upon being aware of the press conference and releases the city manager called a meeting, which was attended by the five appellees. At this meeting the city manager was described as "being beside himself with rage, his face being colorless and distorted." It was difficult for him to speak. He, according to some evidence, engaged in a tirade and stated his administration had been embarrassed and that his leadership had been seriously questioned. These matters are in the record and before the jury.

We think it is important to note that appellees demanded protection under the Texas Whistleblower Act. The rights contained in the Bill of Rights possess ample legal grandeur; the Whistleblower Act makes meaningful the guarantees of freedom of speech, peaceable assembly, the right to petition the government.

These appellees lived day by day under the Charter of the City of Beaumont, thereby giving them an especial standing to speak and to deliver press releases directly involving the Beaumont City Charter. Although the appellees were not professionally trained, graduate-career journalists, the freedom of the press and the freedom to petition was a precious right to them. We decline to hold that the freedom of the press is restricted to professional print journalists or media reporters.

The appellees maintained that the then city manager had appointed Mr. Patterson as the permanent police chief and that the title of interim police chief was given as a subterfuge or as a pretext. The appellants characterized that contention to the effect that the appellees thought that the then city manager was going to appoint a black as a permanent police chief. Appellees dispute this.

The appellees contended that the city manager was evasive when asked if he intended to appoint Mr. Patterson as the new police chief. One witness testified in substance that the city manager did not and would not deny that Mr. Patterson was to be the new chief, claiming that the decision on that point had not been finalized.

Following that meeting, several staff officers did meet with the former mayor of the city who, it was contended, asked that the police departmental problems caused by the city manager be reported to him. The appellees contend this request was contrary to the Charter, and that Mr. Patterson continued to dissolve police units without consultation with those in charge.

Then, appellees say, relying upon an offer made by the city manager in an agenda they received, the appellees brought their attorney to one of the meetings with the manager. According to the appellees' version of the meeting, the city manager changed his mind regarding the presence of the attorney. The city manager then issued reprimands to the appellees, characterizing their actions as a "startling deficiency of sound judgment". Appellees argue that these reprimands were in violation of the personnel policy of the city. Appellees aver that the city manager could not issue reprimands—only heads of departments being empowered to do so. Basically, the appellees maintain that they were discriminated against as a result of their reporting a violation of the law of the Charter and for their exercising their constitutionally guaranteed rights. In summary, the charge is laid that the then city manager implemented and put into effect retaliatory, discriminatory practices which were intended and ultimately brought about the demotion of one appellee and the constructive discharge of the remaining four. Also, the officers' pay was reduced and their rank diminished and they were assigned duties less important.

A second meeting called by the city manager was held in early March of 1987. Four of the appellees attended. The city manager personally gave written reprimands to the four. These reprimands were issued to the press. Appellees argue that they had never

been disciplined in their careers as policemen. One major testified that the reprimands were so worded as to assassinate the character and reputation of the appellees. The appellees' position was that the publication of these reprimands from the city manager resulted in a situation that impugned their integrity. Briefly put, the appellees maintain that they were driven from their employment with the Beaumont Police Department. They became isolated and were ostracized. The police department was restructured and each new division was to be administered by a deputy chief. The deputy chief was to be appointed by the chief of police rather than promoted through competitive examinations. Appellees contend they were the command staff but they were not consulted about these basic changes. These reorganization plans demoted the appellees in their responsibility and in their duties. Their tasks became meaningless.

As an example, in one instance a captain was initially assigned to more responsibility; then he received a direct order not to be involved; later he was given a direct order by a new deputy chief to get involved. The captain was then in a "no-win" situation. The appellees' positions were systematically eliminated and the rank of major was dissolved. Appellees contend that the city manager through his conduct had effectively eliminated their positions and brought about their demotions even though their positions had been achieved after years of dedicated work and through competitive examinations.

In fact, in September of 1988 the appellees were advised in a written instrument that the City Council had passed a new city ordinance which abolished the rank of police major. Their pay was cut in October of 1988. Appellees vehemently argue that the record demonstrates that no part of their employment would be safe from retaliation. At about this time an enhanced retirement program or incentive was put in place. Appellees say that there was no hope of any continued employment or any peaceful relationships with certain of the appellants. Because their work conditions had become intolerable, the appellees were compelled to leave. Only one captain remained. He sustained a demotion and pay cut. He was ineligible for retirement.

In summary, the appellees say that the then city manager discriminated and retaliated against the appellees in the first instance for reporting a violation of the law, being a violation of the Charter. This discrimination and retaliation under the circumstances was prohibited by the Texas Whistleblower Act. Appellees advocated the enforcement of the local hiring preferences as mandated by the basic law of the city.

### Points of Error One and Two

In their initial brief the appellants present twelve points of error. The first point of error contends that the trial court erred in denying the appellants the right to establish at a time before the venire panel was dismissed and the jury was sworn, that race had been a factor in the plaintiffs' use of their peremptory strikes, thus depriving the appellants and also the excluded jurors of their due process and equal protection rights guaranteed by the Texas Constitution and the United States Constitution.

The second point of error is akin to the first. The second point of error advances that the appellants made proper and timely objections to the plaintiffs' use of peremptory strikes to exclude blacks from serving on the jury which heard the case, thus depriving the appellants and the excluded jurors of their due process and equal protection rights. No record had been made of the voir dire and by an earlier unpublished per curiam opinion delivered June 18, 1992, this Court partially abated the cause and ordered a limited remand to the trial court for the purpose of conducting a hearing under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Pursuant to this Court's order, the trial court conducted a *Batson* hearing on August 19, 1992, and at the conclusion thereof, made and filed the following findings of fact and conclusions of law:

### FINDING OF FACT

1. On January 14, 1991, the Court called the above styled and numbered case

for trial and all parties through their counsel announced ready for trial.

2. The Court empaneled a jury panel consisting of forty-eight persons as listed on the Juror Information List and the panel filled out the juror information form for each juror which was reproduced and given to counsel for use in voir dire.

3. The individual Plaintiffs are not members of an identifiable minority racial group. The Individual Defendants are not members of an identifiable minority racial group. No live witnesses were called to testify at the trial of this case who are members of an identifiable racial group.

4. At 1:35 p.m., voir dire of the jury panel began with Plaintiff's counsel asking both general and specific questions of the panel and the individual members.

5. At 4:10 p.m. on January 14, 1990, [sic, 1991] the voir dire was concluded with the lawyers then ordered to make their respective strikes, each side having been given six (6) peremptory challenges to be exercised on the first twenty-nine (29) jurors and one peremptory challenge to be exercised on jurors numbers 30 through 33. Juror Nos. 8, 9, 14, 20 and 26 were excused for cause.

6. The Plaintiffs struck juror nos. 3, 5, 10, 17, 18 and 28 from among the first 29 jurors and struck no. 32 from among juror nos. 30 through 33.

7. Plaintiffs exercised five of their peremptory challenges against the following black venire panel members: No. 3—Helen E. Louis; No. 5—Boyd Williams, III; No. 17—Richard L. LaPoint; No. 18—Johnny D. Polar; and No. 32—Sandra La-Bove.

8. Following the completion of voir dire but before the jury had been seated or sworn, the counsel for Defendants had the following proceedings in chambers concerning the jury strikes for cause and the assistant to the trial counsel for Defendants indicated that before the jury was seated and sworn he wished to lodge an objection to the jury selection process requesting the Court to note that Mr. Kirk "has once again used all of his peremptory strikes to exclude black persons from the panel".

9. The Court finds the statement by Assistant City Attorney Joe Sanders was incorrect in that the Plaintiffs jury list struck seven (7) persons from the panel, five (5) of whom were black. Two of Plaintiffs peremptory challenges were used to exclude white persons from the panel.

10. The Court heard and observed the entirety of the voir dire of the jury and, based thereon, was, at the time of Assistant City Attorney Joe Sanders' statement on January 14, 1991, and is, now of the opinion that his statement was not correct, and now finds that no racially discriminatory strikes were made by Plaintiffs.

11. That neither the Juror Information Forms nor the Plaintiffs' jury list, Defendants' jury list or any of the Plaintiffs' counsel's notes from voir dire provides the Court with any basis for determining the race of persons on the panel. The Court finds from the evidence that No. 3—Helen E. Louis, No. 5—Boyd Williams, III, No. 17—Richard L. LaPoint, No. 18—Johnny D. Polar and No. 32—Sandra LaBove are black.

12. The Court finds that the counsel for Plaintiffs' general strategy in selecting the jury in the instant case, was to accept the first twelve (12) people who could return a fair verdict under the unique set of facts presented in the subject case. At the January, 1991 trial of the case at bar, Plaintiffs' counsel looked for a juror who was:

(a) intelligent;

(b) capable of understanding the issues and evidence presented and concentrating on them without outside interference or distraction;

(c) capable of making an informed decision based upon the evidence;

(d) not prejudiced against his clients; and

(e) with respect to the issues in this case, believed in strict enforcement of the law, police authority and supported Beaumont Police Vice Squad activity, since Plaintiffs were advocating strict enforcement of the City Charter.

13. The Court further finds that the above referenced method of jury selection employed by Plaintiffs' counsel in the instant case is race neutral and does not utilize race, creed or color as a means of purposefully or deliberately denying jury participation to any person, including black persons.

14. The Court finds that Plaintiffs struck and used a peremptory challenge on juror no. 3—Helen E. Louis in accordance with counsel for Plaintiffs' aforesaid strategy and for the following race neutral reasons, based on discussions with her during voir dire and impressions derived there and from her Juror Information Form which demonstrated or led Plaintiffs' counsel to believe that: (a) she did not understand and follow the proceedings; (b) was unable to comprehend the concepts of law that were being presented and would be unable to follow the evidence; (c) that she had difficulty completing the Juror Information Form, and difficulty in spelling and writing and may have been of low intelligence. Specifically, she filled out her occupation on the Juror Information Form as "Cooks" and listed her husband's occupation as "Med Jeffon Hosp" and where it requested her husband's name, listed her own name, and in the space requesting her place of birth, wrote "Louianse" and left five (5) spaces blank.

15. The Court finds that Plaintiffs struck and used a peremptory strike on juror no. 5—Boyd Williams, III in accordance with Plaintiffs' counsel's aforesaid strategy and for the following race neutral reasons based on discussions with him during voir dire and facts contained in his Juror Information Form which demonstrated or led Plaintiffs' counsel to believe that: (a) he was then a member of the Army National Guard; (b) that he might be called to active duty at any time in connection with the military action in the Middle East, which at that time was underway, giving Plaintiffs' counsel concern that Mr. Williams would not be able to concentrate on the issues and evidence presented without interference and distraction by the events in the Persian Gulf War and the likelihood of his call to active duty; (c) that Plaintiffs' counsel was aware that the trial of this case would take at least two weeks and was concerned about losing jurors as the first trial of this case in 1990 had been completed with only 11 jurors and thus was reasonably concerned as to whether juror no. 5—Boyd Williams, III, would be available to serve as a juror through the completion of the trial and a jury verdict.

16. The Court finds that Plaintiffs struck and used a peremptory strike on juror no. 10—Ronald L. Ermel, in accordance with Plaintiffs' counsel's aforesaid strategy and for the following race neutral reasons based on discussions with him during voir dire, impressions derived from his Juror Information Form and his dress and appearance which demonstrated or led Plaintiffs' counsel to believe that: (a) he was employed as a "supervisor-finance" by Chevron; and (b) Plaintiff's counsel was concerned that based on this juror's finance background, he might attempt to impose his own knowledge and expertise in finance with respect to the evidence presented by Plaintiffs regarding their damages and would possibly influence other members of the jury in opposition to Plaintiffs and require a higher burden of proof on material issues, including damages, rather than a preponderance of the evidence.

17. The Court finds that Plaintiffs struck and used a peremptory strike on juror no. 17—Richard LaPoint in accordance with Plaintiffs' counsel's strategy and for the following race neutral reasons based on discussions, observations and impressions during voir dire and facts contained in his Juror Information Form which demonstrated or led counsel to believe that: (a) Mr. LaPoint was employed in maintenance at Virginia Estates Apartment in Beaumont; (b) that in questioning by Plaintiffs' attorney concerning jurors' attitudes towards strict law enforcement, support for the Beaumont Police Vice Squad activity, and police authority, Mr. LaPoint's failure to affirmatively respond to such questions led Plaintiffs' counsel to conclude that Mr. LaPoint could not com-

mit and had not committed to be fair and impartial in consideration of the Police Officers involved in this case; (c) Mr. La-Point's reaction to such questions including movement, slow responses to questions, together with inattentiveness following this line of voir dire questioning, revealed little support for strict enforcement of the law; (d) Mr. LaPoint indicated he was under a doctor's treatment and on medication and did not know if he could make it through a long trial; (e) Plaintiffs' claims made in this case were based on their advocation of strict enforcement of law (City Charter), for which this juror indicated, at best, lukewarm support.

18. The Court finds that Plaintiffs struck and used a peremptory strike on juror no. 18—Johnny D. Polar, in accordance with Plaintiffs' counsel's strategy and for the following race neutral reasons, based on discussions and impressions obtained during voir dire, observations of this juror during the voir dire process (his discussions with the Bailiff), and facts contained in his Juror Information Form which demonstrated or led Plaintiffs' counsel to believe that: (a) Mr. Polar's indication during voir dire in response to questions about strict law enforcement that he had problems in the past with authorities seeking to enforce the law (a building inspector) from which Plaintiffs' counsel concluded that Mr. Polar did not support strict enforcement of the law, contrary to Plaintiffs' position, who were advocating strict enforcement; (b) this juror knew and was friendly with this Court's Bailiff, Ike Linden. During the first trial of this case in September 1990, Deputy Linden had given a press interview which caused Plaintiff's counsel concern; and Mr. Kirk preferred jurors who were not familiar with personnel or attorneys in the case, including the bailiff because he did not know how the bailiff felt about the case and had asked that another deputy be assigned as bailiff for this case, replacing Deputy Linden, which request was refused by the Court.

19. The Court finds that Plaintiffs struck and used a peremptory strike on Juror No. 28—Lowell Burlin in accordance with Plaintiffs' counsel's aforesaid strategy and for the following race neutral reasons, based on discussions and impressions obtained during voir dire which demonstrated or led Plaintiffs' counsel to believe that: (a) Mr. Burlin had testified previously in a civil trial on behalf of a defendant and would thus tend to be sympathetic to Defendants and against the Plaintiffs; (b) It appeared during the voir dire conducted by the City of Beaumont that Mr. Nichols was able to establish a better rapport with Mr. Burlin that were Plaintiffs and their attorney, which reinforced Plaintiffs' counsel's conclusion that this juror was more favorably inclined toward the defense.

20. The Court finds that Plaintiffs used a peremptory strike on juror no. 32—Sandra LaBove in accordance with Plaintiffs' counsel's aforesaid strategy and for the following race neutral reasons, based on discussions, impressions and observations obtained during voir dire process which demonstrated or led Plaintiffs' counsel to believe that: (a) there was some connection between Ms. LaBove and City Attorney Lane Nichols and/or Joe Sanders, Assistant Attorney for Defendants (specifically, Ms. LaBove was observed looking at Mr. Sanders and/or Mr. Nichols during Mr. Kirk's voir dire questioning of the panel, and it was reported to Mr. Kirk that Ms. LaBove was observed chatting with Mr. Sanders during a break and based on these observations, Mr. Kirk believed and was concerned that Ms. LaBove knew Mr. Sanders or Mr. Nichols, or both, and would favor and be biased for the Defendants because of that perceived relationship); and (b) she related much better to the Defendants and had a much better rapport with Defendants' counsel during their voir dire and was very responsive to their questioning.

21. The race of the persons stricken by Plaintiffs through use of their peremptory strikes was not a factor nor a consideration for their having been stricken.

22. It was clear from the voir dire conducted on January 14, 1991 that Plaintiffs had a racially neutral basis for each of their peremptory strikes.

23. None of the unchallenged jury members possessed the same characteristics undesirable to Plaintiffs as possessed by those panel members who were the subject of Plaintiffs' peremptory strikes.

24. Plaintiffs used none of their peremptory strikes in a manner which was racially discriminatory.

25. There is no credible evidence that Plaintiffs' counsel engaged in intentional, purposeful racial discrimination in the selection of jurors and use of Plaintiffs' peremptory challenges.

26. Plaintiffs peremptory strikes of juror no. 3—Helen Lewis, juror no. 5—Boyd Williams, III, juror no. 17—Richard LaPoint, juror no. 19—Johnny D. Polar, and juror no. 32—Sandra LaBove, were not racially motivated.

27. Defendants have failed to meet their ultimate burden of persuasion of showing or proving purposeful racial discrimination. There is no credible evidence of probative force that establishes that Plaintiffs' counsel engaged in purposeful racial discrimination through use of any of his peremptory strikes.

28. There was no disparate treatment by Plaintiffs in the exercise of their peremptory strikes between persons with the same or similar characteristics as the challenged jurors and those who were not struck.

29. There was no disparate examination of members of the venire panel by Plaintiffs during their voir dire.

30. The explanation given by Plaintiffs' counsel for their peremptory strikes which can or could be considered to be based on a group bias was shown, under the circumstances of the voir dire in this case, to apply to the challenged jurors specifically. *Whitsey v. State,* 796 S.W.2d 707, 713–14 (Tex.Crim.App.1989).

31. The reasons offered by Plaintiffs' counsel for each of their peremptory strikes is a clear and reasonably specific explanation of a legitimate racially neutral reason for using a peremptory challenge on a juror.

32. Plaintiffs' counsel in the instant case did not exercise his peremptory challenges in a discriminating manner to exclude venire persons based upon racial considerations, nor did he, in any way, purposefully or deliberately deny jury participation to black persons because of race.

## CONCLUSIONS OF LAW

33. Peremptory strikes based on a potential juror's inability to follow or understand evidence, inability to spell and complete a Juror's Information Form constitute a racially neutral explanation for use of peremptory challenges. *Hernandez v. State,* 808 S.W.2d 536 (Tex.App.—Waco 1991 [no pet.]).

34. A venire member's leaving five blanks on her Juror Information Form and the writing on the card indicating that she had difficulty in spelling and writing and may have been of low intelligence, constitutes a racially neutral reason for striking a venire member. *Allen v. State,* 811 S.W.2d 673 (Tex.App.—Dallas 1991 [pet. ref'd]); *Dennis v. State,* 772 S.W.2d [525] 526–27 (Tex.App.—Beaumont 1989) [*pet. dism'd, improvidently granted,* 798 S.W.2d 573 (Tex.Crim.App.1990)].

35. Peremptory strikes based on counsel's belief that a juror may be unavailable to complete jury service constitutes a racially neutral reason for use of a peremptory strike where the trial was expected to last at least two weeks, the previous trial resulted in a hung jury with only eleven (11) jurors and the panel member in question was subject to being called to active duty in the military in the Middle East War at any time.

36. A jury panel member's inattentiveness and unresponsiveness is a racially neutral reason for exercising peremptory challenge where associated with non perfunctory voir dire questioning regarding strict law enforcement and Plaintiffs' trial strategy of striking panel members who failed to exhibit an attitude supportive of strict law enforcement. *Daniels v. State,* 768 S.W.2d 314, 317 (Tex.App.—Tyler 1988, pet. ref'd); *Moore v. State,* 811 S.W.2d 197, 199 (Tex.App.—Houston [1st Dist.] 1991 [pet. ref'd]).

37. Failure of a juror to respond affirmatively to questions concerning attitudes supporting strict law enforcement, vice squad activity and police authority is a racially neutral explanation for the use of peremptory strikes in a case involving five career police officers as Plaintiffs and their advocating strict enforcement of City Charter provisions, and their contention that they were effectively and constructively discharged in retaliation for reporting a violation of law where associated with non perfunctory voir dire questioning regarding strict law enforcement and Plaintiffs' trial strategy of striking panel members who failed to exhibit an attitude supportive of strict law enforcement. *U.S. v. Sherrills,* 929 F.2d 393 (8th Cir.1991); *U.S. v. Moore,* 895 F.2d 484 (8th Cir.1990); *Moore v. State,* 811 S.W.2d 197, 198 (Tex.App.—Houston [1st Dist.] 1991 [pet. ref'd] ), *Daniel [Daniels] v. State,* 768 S.W.2d 314, 317 (Tex.App.—Tyler 1988, Pet. ref'd. [sic] ).

37. A trial strategy to strike persons who might be more inclined to have liberal attitudes towards strict law enforcement, vice squad activity and police activity constitutes a racially neutral reason for the use of peremptory strikes. *U.S. v. Prine,* 909 F.2d 1109.

38. A peremptory challenge based on apparent familiarity or friendship between a juror and one of the lawyers for the opposition constitutes a racially neutral reason for the use of a peremptory strike. *Hernandez v. State,* 808 S.W.2d 536 (Tex. App.—Waco 1991 [no pet.] ).

39. Examining Plaintiffs' counsels reasons for his peremptory strikes in light of the circumstances of this particular case, the racial composition of the panel, and having witnessed the Plaintiffs' voir dire, Defendants' voir dire, the voir dire testimony of each panel member and the comment and testimony from the Batson hearing, there is no credible evidence that Plaintiffs' counsel engaged in purposeful racial discrimination in the exercise of peremptory strikes in this case.

40. A neutral explanation is one "based upon something other than the race of the juror". *Hernandez v. New York,* [500]

U.S. [352,] 111 S.Ct. 1859 [114 L.Ed.2d 395] (1991); *Moore v. Keller Industries, Inc.,* 948 F.2d 199, 201 (5th Cir.1991).

41. Once Plaintiffs' counsel has stated racially neutral explanations for the peremptory challenges in question, and the Court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the Defendants have made a prima facie showing becomes moot. *Hernandez v. New York,* [500] U.S. [352,] 111 S.Ct. 1859, 1865 [114 L.Ed.2d 395] (1991).

42. In the event any of the Findings of Fact made herein are determined to be Conclusions of Law, they are adopted as such. In the event any of the Conclusions of Law stated herein are determined to be Findings of Fact, then they are hereby adopted as such.

On August 24, 1992, the trial court entered its order overruling the appellants' *Batson* objections.

This is the second trial of this dispute. In the first trial, which occurred in September, 1990, the trial court declared a mistrial because of a hung jury. At the second trial, which occurred in January 1991, the jury returned a 10–2 verdict in favor of the appellees.

At the *Batson* hearing, the appellants sought to elicit testimony that appellees, during the jury selection process at the *first* trial, used all seven of their peremptory challenges to strike black persons from the jury panel. In their Supplemental Brief, appellants first assert that the trial court erred in excluding this evidence because it established a pattern of racial discrimination.

In response to this assertion, the appellees contend that: (1) the appellants waived any error by not offering their bill of exception into evidence and obtaining a ruling thereon; (2) the excluded evidence was merely cumulative of other proof admitted into evidence; and (3) because the trial court, at the *Batson* hearing, considered and found credible the race-neutral explanations given by appellee's counsel, it was not required to consider additional, cumulative evidence tending to show

the disproportionate exclusion of members of the black race.

■ The record made at the *Batson* hearing does not conclusively reflect the trial court's ruling on the exclusion of the bill of exception evidence, but we believe the only inference to be gained from the record shows the trial court considered the bill and rejected it. However, the record also shows that the trial court was made fully aware of the number of black persons who had been excluded by the appellee's peremptory challenges at the first trial. Because the excluded bill of exception evidence was simply cumulative of undisputed factual evidence before the court, we overrule appellants' first supplemental point of error.

In the appellant's second, third and fourth points of error, they contend the trial court erred in concluding: (a) that appellees' counsel had not engaged in purposeful racial discrimination in the jury selection process, and (b) that appellees' counsel offered race-neutral explanations for his peremptory challenges. Appellants argue that the evidence is legally and factually insufficient to support the trial court's findings and conclusions and that its findings are against the great weight and preponderance of the evidence.

■ In reviewing these points of error, we are mindful of the standards of review established by the highest state criminal appellate court for the appellate review of *Batson* rulings. Thus, in our review, we will apply the "clearly erroneous" standard adopted by the Texas Court of Criminal Appeals. *See, Vargas v. State*, 838 S.W.2d 552, 553, (Tex.Crim. App.1992) (en banc). Using this standard, we must review the *Batson* evidence in the light most favorable to the trial court's rulings and determine if those rulings are supported by the record. *Id.*, at 553. After giving due deference to the trial court's factual determinations, we may reverse only if we are left with a "definite and firm conviction that a mistake has been committed." *Id.* at 554; *see also, United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

At the *Batson* hearing, it was established that the appellees used five of their seven peremptory strikes to challenge black potential jurors. The trial court's findings of fact set forth in detail the bases for these strikes, and it will serve no useful purpose to repeat each of those findings here. We will briefly discuss the appellants' complaints and the appellees' responses regarding those findings:

■ 1. Juror Helen E. Lewis: The court found this juror was challenged because of appellees' concern that she did not understand and could not follow the proceedings and would be unable to comprehend the concepts of law and the evidence. Appellees were also concerned about her ability to spell and write. Appellant asserts that appellees' counsel contradicted himself by first testifying that this juror misspelled "most of the words" on her juror information card, and later conceded that only two words had been misspelled and that spelling had not been one of the bases for his strike. The appellees answer this charge by quoting the full response of their counsel as follows:

Q: All right, now that was one of the bases of your strike of—of Ms. Louis, is that correct?

A: No. It's just an indicator. I think the basis had more to do with her inability to basically follow a conversation, give coherent answers to questions.

The appellees also assert that other jurors who had misspellings on their juror information cards did not demonstrate the poor literacy skills that this juror exhibited in her verbal communications. We find there is sufficient evidence to support the trial court's findings that there were no race-related reasons for the peremptory challenge of this juror.

■ 2. Juror Boyd Williams: Appellants contend the race-neutral explanation given by appellees' counsel about this juror (that the juror might be called to active military service in the Persian Gulf War) is unacceptable because the juror's information card showed membership in the Army National Guard, not the Army Reserve; therefore, appellants argue, the juror could not have been called to active military duty. We over-

rule this contention. Appellee's counsel testified that he was advised by the prospective juror of the possibility he, the juror, could be called to active duty in a week or two. We find sufficient evidence to support the trial court's determination that this juror was challenged because of counsel's reasonable concern about the juror's availability to complete the trial.

■ 3. Juror Richard LaPoint: Appellants contend the facially race-neutral explanation of appellees' counsel (that the juror's employment as a maintenance person at a local apartment in a high crime area, and his failure to respond affirmatively to counsel's questions, led counsel to believe he might not support strict enforcement of the law) was destroyed by counsel's concession that it was "possible" for someone who worked in a high-crime area to be more inclined to support zealous law enforcement than someone who did not. We do not agree and find the record fully supports the trial court's finding regarding this juror.

■ 4. Juror Johnny Polar: Appellants contend the race-neutral explanations of appellees' counsel regarding this juror are doubtful for two reasons: First, appellees' counsel described the juror (Polar) as being large, tall and heavy set, while another juror testified he was a small man of short or medium height. Second, the appellees tried to have the black bailiff (who knew Polar) removed from the case, because they suspected the bailiff had issued a press release at the first trial. This, appellants contend, clearly shows the racial bias of appellees against all black persons, whether they be a court official or a potential juror. The trial court found that appellees' counsel was concerned about whether: (a) this juror would support strict law enforcement; (b) the juror knew and was friendly with the court bailiff; and (c) the bailiff had given a press interview during the first trial, a matter which concerned appellees' counsel. There is sufficient evidence in the record to support these findings.

■ 5. Juror Sandra LaBove: Appellants claim that the race-neutral explanations of appellees' counsel regarding this juror are

"highly suspicious." According to the trial court's findings, these explanations were that: (a) there could be "some connection" between the juror and appellants' counsel, and appellees' counsel was told that the juror knew one or both of appellants' counsel and therefore might be biased in favor of their client; and (b) the juror seemed to relate much better to appellants' counsel during the voir dire examination. In their supplemental brief on this appeal, appellants complain that these explanations are suspicious because there is no specific evidence, such as the appellees' voir dire notes, to show that the juror interacted more favorably with appellants' counsel, and no evidence showing that the juror knew either of appellants' counsel. Finally, appellants' argue, the testimony of this juror at the *Batson* hearing discredits the race-neutral explanations of appellees' counsel, because she said she could not recall having been asked any questions during the voir dire examination. Appellants' further argue that the juror was shown to have a significant degree of literacy skills and that appellees' racial motivations are demonstrated by the manner in which the juror was challenged when she was erroneously called as an acceptable juror. The trial court's findings, which we find supported by the record, show that this juror was challenged because of a reasonable concern that she had some connection with the appellants' counsel, which might cause her to be favorably biased toward the appellants' case. The record shows only that she (and appellants' counsel) could not recall that she had been individually questioned by appellees' counsel during the voir dire examination.

At the Batson hearing, after appellees' counsel concluded the explanation of his reasons for excluding Sandra LaBove as a juror, he was asked:

Q. Now, was the race of any one of the jury venire members a reason for your exercising a peremptory challenge on that person?

A. No, sir.

Q. Did you have an intent as part of the striking of your jury to exclude all persons of any one particular race from the jury?

A. No, sir.

The trial court expressly found in this case that:

1. Race was not a factor in the use of appellees' peremptory challenges.

2. It was clear from the voir dire proceeding that appellees had a racially neutral basis for each of their peremptory strikes.

3. None of the unchallenged jury members possessed the same characteristics undesirable to appellants as those who were challenged by such peremptory strikes.

4. Appellees did not use any of their peremptory challenges in a manner that was racially discriminatory.

5. There is no credible evidence that appellees' counsel engaged in intentional, purposeful racial discrimination in the jury selection process.

The trial court's factual findings are necessarily based on the court's evaluation of the demeanor and credibility of the witnesses and the evidence, such matters being peculiarly within the trial court's province. *Hernandez v. New York,* 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); *Vargas,* 838 S.W.2d at 554. We have considered the trial court's findings and conclusions in the light of the evidence in the record viewed in its entirety. Because we find the trial court's determination to be plausible and supported by the evidence, we find no basis to conclude that the trial court's findings are clearly erroneous. *Vargas,* at 556; *Whitsey,* 796 S.W.2d at 722. In this respect, we find no rebuttal or impeaching evidence which shows the appellees' race-neutral explanations to be pretextural or insufficient as a matter of law. *Cf., Emerson v. State,* 851 S.W.2d 269 (Tex. Crim.App.1993). We overrule appellants' supplemental points of error two, three and four.

■ In their fifth supplemental point of error, the appellants contend the trial court's findings and conclusions show that it failed to apply the proper standard of law in making its determination of their state civil law Batson challenge. The appellants contend that the trial court's finding number 5, which concludes that appellees' counsel did not engage in intentional, purposeful racial discrimination follows an erroneous standard, and that the proper standard is whether the evidence shows race was a factor in counsel's exercise of a single peremptory challenge. *See, Powers v. Palacios,* 813 S.W.2d 489, 491 (Tex.1991) (equal protection denied when race is a factor in counsel's exercise of a peremptory challenge.)

We overrule appellants' fifth supplemental point of error. In its first finding of fact, the trial court specifically found that the race of the persons excluded by the appellees through the use of their peremptory challenges was not a factor for their having been so excluded from the jury panel. Moreover, such a finding is implicit in the trial court's determination that appellees had a racially neutral basis for each of their peremptory strikes. *See, Vargas,* 838 at 556.

We sustain the trial court's order overruling the appellants' *Batson* objections. Appellants' points of error one and two are overruled.

### Point of Error Three

In essence, point of error number three advances the contention that the trial court erred in overruling the defendants' objections to questions number four and five because there is no State constitutional tort and that in the absence of a waiver of immunity, the defendant City of Beaumont and its employees, acting in their official capacities, enjoy sovereign immunity from such claim.

Jury question number four and the finding of the jury to this special question is found in the record:

QUESTION 4: Do you find from a preponderance of the evidence that City Manager Albert Haines retaliated against one or more of the below listed Plaintiffs for having advocated enforcement of the local hiring preference contained in the Charter of the City of Beaumont?

You are instructed that Article XVII, Section 7 of the Beaumont City Charter provides that, qualifications being equal, citizens of Beaumont shall be given preference in employment by the City.

Article 1, Section 8 of the Texas Constitution protects the liberty of speech. Article 1, Section 27 protects the right of Texas citizens to in a peaceable manner, assemble together for their common good; and apply to those invested with the powers of government for redress of grievance or other purposes by petition, address or remonstrance.

| | We do so find (yes) | We do not so find (no) |
| --- | --- | --- |
| Eugene Corder | yes | |
| Charles Perricone | yes | |
| Woodford Bouillion | yes | |
| John Parsons | yes | |
| Cecil Rush | yes | |

The defendants' counsel at trial objected to the submission of question number four for the following reasons:

[APPELLANTS' COUNSEL]: Special Issue No. 4, first we would submit that this issue apparently is a constitutional tort and that in the absence of a legislative grant of immunity that the City of Beaumont as a municipality enjoys sovereign immunity from such claims.

. . . .

THE COURT: Overruled.

Jury question number five and the fact-finders' finding thereto was as follows:

QUESTION 5: Do you find from a preponderance of the evidence that one or more of the below listed Plaintiffs was constructively discharged by Defendant City of Beaumont for having advocated enforcement of the local hiring preference contained in the Charter of the City of Beaumont?

For purposes of your answer, a constructive discharge occurs when an employer makes conditions so intolerable for an employee that a reasonable person in that employee's position would have felt compelled to resign. The determinative factor is not the employer's intentions, but the effect of the conditions upon a reasonable employee.

You are instructed that Article XVII, Section 7 of the Beaumont City Charter provides that, qualifications being equal, citizens of Beaumont shall be given preference in employment by the City.

Article 1, Section 8 of the Texas Constitution protects the liberty of speech. Article 1, Section 27 protects the right of Texas citizens to in a peaceable manner, assemble together for their common good; and apply to those invested with the powers of government for redress of grievance or other purposes by petition, address or remonstrance.

| | We do so find (yes) | We do not so find (no) |
| --- | --- | --- |
| Eugene Corder | yes | |
| Charles Perricone | yes | |
| John Parsons | yes | |
| Cecil Rush | yes | |

The objection was:

[APPELLANTS' COUNSEL]: With respect to Special Issue No. 5, we submit, again, that there is no constitutional tort, and in the absence of a waiver of immunity, the Defendant, City of Beaumont, enjoys sovereign immunity from such a claim, . . .

. . . .

THE COURT: Overruled.

The appellants repose an important reliance upon *Bagg v. Univ. of Texas Medical Branch,* 726 S.W.2d 582 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.). There the plaintiff sued his employer, the University of Texas Medical Branch at Galveston, claiming that he had been wrongfully terminated. The employee sought damages and equitable relief for a constitutional tort because the medical branch had retaliated against him for exercising his constitutional right of free speech. The district court dismissed the plaintiff's action against the medical branch. The Court of Appeals affirmed on the basis that the medical branch was an agency of the State of Texas and therefore entitled to sovereign immunity. The University of Texas Medical Branch at Galveston is clearly a medical and educational facility. *See* TEX.EDUC.CODE ANN. §§ 65.02(a)(8), 74.-001 (Vernon 1991). These sections specifically mention and exempt UTMB Galveston. Beaumont is not such a medical and edu-

cational facility. The appellants cite *Russell v. Edgewood Independent School District*, 406 S.W.2d 249 (Tex.Civ.App.—San Antonio 1966, writ ref'd n.r.e.), arguing that since the individual appellees in *Bagg* were acting in their official capacities that each of them in turn enjoyed and were protected by the same governmental immunity. UTMB is part of the University of Texas system, having important educational functions. Our Supreme Court has made a distinction, however, in suits that involve the unlawful actions of state officials as distinguished from lawful actions. Here the appellees' theory is that the appellants had engaged in actions not within proper legal authority. Hence, the acts and conduct of officials, who were not lawfully authorized to do the acts, may be the foundation of a cause of action that is not within the protection of sovereign immunity. We conclude that appellants do not come within the purview of TEX.EDUC.CODE ANN. §§ 65.02(a)(8), 74.001.

The appellees insist that they have a cause of action because they were discriminated against, retaliated against and were constructively discharged for reporting a violation of law, and in connection with that reporting, they exercised their rights of free speech and of peaceable assembly. The appellees vehemently contend that the Texas Constitution itself provides for an independent grounding to assert a constitutional cause of action and assert a violation thereof, even though a governmental entity interferes with the individual's constitutionally protected rights.

The appellants challenge the appellees' position stating that there is no constitutional cause of action under TEX.CONST. art. I, § 8. The appellees' rejoinder is that the Texas Constitution itself provides for an independent grounding to assert a constitutional cause of action wherein a governmental entity or the officials thereof interfere with an individual citizen's rights which are protected by the Constitution. This basic right insures the liberty to speak and to write and to publish a citizen's opinion upon any subject, being responsible for the abuse of that privilege. This article assures that no law shall ever be passed curtailing the liberty of speech or the freedom of the press. The

appellees' causes of action in pleading for relief are based upon the Texas Constitution—but not exclusively so. The thrust or gravamen of the appellees' causes of action is also founded on the City Charter of Beaumont as well as the Texas Whistleblower Act.

■ But the constitution does provide for an independent grounding to assert a constitutional cause of action where a governmental entity interferes with an individual's constitutionally protected right, especially those rights enumerated in the Bill of Rights. *See,* Philip J. Pfeiffer & W. Wendell Hall, *Employment and Labor Law,* 43 Sw.L.J. 81, 94 (1989); James C. Harrington, *Free Speech, Press, and Assembly Liberties Under the Texas Bill of Rights,* 68 TEX.L.REV. 1435, 1490 (1990).

In *Jones v. Memorial Hosp. System,* 746 S.W.2d 891 (Tex.App.—Houston [1st Dist.] 1988, no writ), the Court wrote:

> We accordingly hold that article 1, section 8 of the Texas Constitution constitutes an independent legal basis for a cause of action claiming an infringement of the right of free speech guaranteed by that section of the state constitution. *See* Friesen, *Recovering Damages For State Bill of Rights Claims,* 63 Tex.L.Rev. 1269, 1280–1284 (1985); *Restatement (Second) of Torts,* sec. 874A (1979).

In *Jones* the Court reasoned that each case must be analyzed and tested on the basis of its own particular facts. *Id.* at 894. *See and compare Gold v. Campbell,* 54 Tex. Civ.App. 269, 117 S.W. 463 (1909, no writ). Jones contended that the district court erred in holding that the termination of her employment by the hospital system was not a violation of her guaranteed right of free speech under the Texas Constitution. The contentions in *Jones* are not dissimilar to those raised by the appellants in their point of error number three to the effect that there was simply no State of Texas constitutional cause of action protecting freedom of speech and the right to peaceably assemble. The Court in *Jones* disapproved the contention that there was no constitutional cause of action and held that Article 1, section 8 of the Texas Constitution was the ground of an independent legal basis for a cause of action

against a public entity when allegedly the rights of free speech and peaceable assembly were violated. The Court wrote further:

> Because we are concerned with the affirmative provisions of the Texas Constitution, rather than first amendment freedoms of the federal constitution, we are not restricted to the same tests used by the federal courts. *City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 293, 102 S.Ct. 1070, 1076–77, 71 L.Ed.2d 152 (1982).

*Id.,* 746 S.W.2d at 895. The Court observed that the free speech amendment of the Texas Constitution—being unlike the federal constitution—affirmatively guarantees that all persons have the right to speak, write or publish their opinions on any subject.

The First Court then adopted a test that required a lower threshold of accountability. The rationale of *Jones* is that the Texas Constitution and its Bill of Rights constitutes an affirmative empowerment to the citizens and residents of Texas and, hence, these affirmative empowerments are not limited by governmental curtailment. We conclude that an independent constitutional tort or cause of action exists under our constitution.

█ As a separate grounding we decline to follow the appellants' contention in point of error three; because if we did so, there would be no redress for violation of constitutionally protected rights by a municipal entity. Appellants' theory, we deem, would be violative of the open courts doctrine as set out in TEX.CONST. art. I, § 13. Hence, affirmatively guaranteed constitutional rights, the Bill of Rights, and the open courts doctrine would become empty and meaningless if the appellants' argued positions were upheld. The Bill of Rights guarantees that all courts shall be open and every person for an injury done to him or his person or his reputation shall have a remedy in open court by a due course of law. *See and compare LeCroy v. Hanlon,* 713 S.W.2d 335 (Tex.1986). Were we to affirm the appellants' position on sovereign immunity, the Bill of Rights would be sterile. The doctrine of sovereign immunity must yield to the Bill of Rights, the Whistleblower Act and the City Charter.

█ The federal constitution can set the floor for certain individual rights and the state constitutions cannot diminish those rights below that floor. On the other hand, state constitutions can establish additional rights and construct ceilings that are above the federal floor. The City's contention of sovereign immunity is in logic repugnant and inconsistent with the basic nature of our basic constitutional rights. A constitutional cause of action implicating the Bill of Rights generally confronts and often challenges wrongful conduct on the part of a governmental entity. It is the constitution itself and especially the sacrosanct Bill of Rights that protect individual persons from impermissible infringements and oppressive violations by government action.

By the express language of the Texas Bill of Rights all municipal governmental power is proscribed. Such usurpation by governmental power must succumb to the Bill of Rights and its guarantees.

█ TEX.CONST. art. I, § 29 reads in relevant part:

> To guard against transgressions of the high powers herein delegated, we declare that everything in this "Bill of Rights" is excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto, or to the following provisions, shall be void.

Stated more aptly, a municipality is not empowered through the doctrine of sovereign immunity to engage in transgressions and usurpations which violate the Texas Bill of Rights. Thus, the constitution itself constitutes a preclusion of governmental immunity. *See, Steele v. City of Houston,* 603 S.W.2d 786 (Tex.1980). Appellants' point of error number three is overruled.

### Points of Error Four through Eight

In appellants' points of error four through eight, they contend the evidence is legally and factually insufficient to support the jury's findings to question No. 1 (retaliation for reporting a violation of law); No. 2 (that such reporting was done in good faith); No. 3 (constructive discharge for reporting a violation of law); No. 4 (retaliation for having

advocated enforcement of the local hiring preference under the City Charter); and No. 5 (constructive discharge for having advocated enforcement of the local hiring preference under the City Charter.) Under these same points of error, the appellants contend the jury's findings on these questions are against the overwhelming weight of the evidence.

In reviewing these evidentiary points, we have applied the applicable standard of intermediate appellate review. Thus, on the no evidence points, we have considered only the evidence and reasonable inferences drawn therefrom in their most favorable light to support the jury's findings. We have disregarded all contrary evidence and contrary inferences and deductions. *King v. Bauer,* 688 S.W.2d 845 (Tex.1985).

On the insufficiency of evidence or factual insufficiency points, we have reviewed the whole record and analyzed the same. Although the plaintiffs' testimony was sharply disputed, the jury was entitled to infer from the evidence that Haynes violated the local preference provisions of the City Charter when he employed Mr. Patterson as interim police chief, and that he discriminated and retaliated against the appellees for reporting a violation of the law and for having advocated enforcement of the local hiring preference. The jury was also entitled to conclude that the appellees had reported the violation in good faith and all of the appellees, except Captain Bouillion, had been constructively discharged as a result of the appellants' unlawful discrimination and retaliation. Thus, we find there is some evidence of probative force to sustain and uphold the jury findings, and under the entirety of the record before us, we do not find that the jury's verdict was so against the great weight and preponderance of the evidence to be clearly wrong and manifestly unjust. *Garza v. Alviar,* 395 S.W.2d 821 (Tex.1965); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEX.L.REV. 361 (1960); St. John Garwood, *The Question of Insufficient Evidence on Appeal,* 30 TEX. L.REV. 803 (1952). We accordingly overrule the legal and factual insufficiency evidence points.

The appellants have presented a forceful case. There were conflicts in the evidence on a number of issues. But the result is that jury issues were created. We are governed by a constitutional provision declaring that jury verdicts in Texas are inviolate. TEX. CONST. art. I, § 15. As an intermediate appellate court we are not at liberty to substitute our own judgment. Strict rules and standards of review apply to jury verdicts. *See and compare Pool v. Ford Motor Co.,* 715 S.W.2d 629 (Tex.1986).

### *Point of Error Nine*

■ Appellants urge point of error number nine, advancing that the trial court erroneously excluded the expert testimony of one of the defendants' experts, being a certified public accountant. The CPA was designated as an expert witness on December 30, 1990; the case was set for trial January 14, 1991. After the designation of this expert, the plaintiffs propounded a set of interrogatories requesting documentation of the expert's opinions. The defendants below made an answer to this second set of interrogatories on January 7th, but a report of the expert was not forthcoming until January 11th of 1991. The appellees argue that they had not received information that had been requested on September 10, 1990, concerning expert opinions. Briefly stated, the appellees argue that the appellants failed to comply with an important rule of discovery, being TEX. R.CIV.P. 166b(6)(b). Additionally, the appellees advance that the trial court was obliged and required to strike the expert pursuant to TEX.R.CIV.P. 215(5) because there was no showing of good cause.

The record reflects that the trial judge was the same jurist before whom this case had been tried once before to a hung jury. After the first mistrial, the appellees propounded a first set of interrogatories to the City of Beaumont. Certain answers to these interrogatories were forthcoming on November 5, 1990. In answer to a certain interrogatory the appellants identified only one Mr. Thomas as an expert witness. The interrogatory involved asked for identification by name, address and telephone number of each person who may be called as an expert witness

and to state the subject matter on which the witness was expected to testify and the mental impressions and opinions held by the expert.

Appellees filed a motion to compel on December 5, 1990. On December 11, about 34 days before the trial date, the appellants filed a supplemental answer to interrogatory number 14, thereby identifying for the first time the certified public accountant. In this connection the appellants failed to provide the appellees with the additional information which had been specifically requested and required by interrogatory number 14. Three days before the trial on the merits, the appellees contend they received one faxed page which apparently was only a partial excerpt of and from a more extensive 19 page report of the second CPA. In this state of the record the trial court was within its discretion in ruling that the appellants had failed to timely provide the additional requested information in response to the interrogatory number 14 of the first set of interrogatories. The trial bench could have perceived the second CPA was retained too late. This point is overruled.

### Point of Error Ten

In point of error number ten, the appellants take the position that jury question number seven was erroneously submitted. Further, that this error was of a reversible nature. Jury question number seven reads:

QUESTION: 7 What sum of money, if any, do you find from a preponderance of the evidence that Plaintiffs should be awarded against the Defendant City of Beaumont as exemplary damages?

"Exemplary Damages" means an amount which you may in your discretion award as an example to others and as a penalty or by way of punishment, in addition to any amount which you may have found as damages in response to Question 6.

Exemplary Damages should not be awarded unless you find the acts of City Manager Haines or Mayor Maurice Meyers, constitute malice, reckless or callous disregard of, or deliberate indifference to,

the legal rights of one or more of the below listed Plaintiffs.

The objections were:

[APPELLANTS' COUNSEL]: As to the special issue authorizing the jury to consider an award of exemplary damages, we would object to the instruction relative to malice as necessary for an award of exemplary damages. We submit that an issue as to malice should be submitted as a separate issues [sic] under the holding in Engleside V. Knupel [sic].

Furthermore, we would submit that the standard for exemplary damages is incorrect and in light of the holding of City of Gladewater V. Pike. And finally, we object to the submission of the exemplary damages issue as to Maury Meyers because there is no special issue inquiring of any wrongful conduct or act on Maury Meyers' part to base an exemplary award of damages upon.

THE COURT: Overruled.

Later, in a motion for judgment non obstante veredicto, the appellants had pleaded that "[t]here was no evidence or the evidence was legally insufficient to establish" any exemplary damages because, the motion proclaimed, there was no evidence that either the city manager or the mayor "were guilty of malice, reckless or callous disregard of, or deliberate indifference to, the legal rights of any of the plaintiffs". Again, a paragraph set forth that "[t]here was no evidence or the evidence was legally insufficient to establish that the plaintiffs were entitled to exemplary damages since there was no finding by the jury" of any malice or any gross negligence on the part of either the city manager or the former mayor; additionally, there was no separate jury question submitted as to any acts of the mayor.

The appellants here argue that the trial court erred in overruling their objections to question number seven below as well as the entry of a judgment based upon jury question seven. The attack is threefold: that there is no evidence to support the submission of the issue; that such issue contained no definition of malice; and that such issue was not predicated upon a finding of any

malice or wrongdoing on the part of the former mayor.

Significant and important is the procedural fact that there was no objection made to the lack of a definition of the phrases "reckless or callous disregard" or "deliberate indifference". Note that the thrust of the objections as relied upon and briefed by the appellants are (1) that there should have been a *separate question* as to the malice and (2) that the standard for exemplary damage was set out in the question incorrectly. Plainly, the appellants did not proffer a substantially correct definition of malice. TEX.R.CIV.P. 273. There was no exception taken *to the disjunctive form used by the trial court.* Importantly, the trial court affirmatively and unequivocally instructed the jury that exemplary damages should not be awarded *unless* the jury found that the acts of the former city manager *or* the former mayor constituted malice, reckless or callous disregard of, or deliberate indifference to, the legal rights of one or more of the listed plaintiffs. Fairly stated then, on balance, the appellants did not object to the grounding of exemplary damages on either the acts of the former city manager *or* the former mayor. We observe that the appellants' objections state that the issue as to malice should follow the holding in the two cases cited; that is, *City of Ingleside v. Kneuper,* 768 S.W.2d 451 (Tex.App.—Austin 1989, writ denied), and *City of Gladewater v. Pike,* 727 S.W.2d 514 (Tex.1987). These broad statements are too general to form an objection to the charge. These objections were not specific nor distinct. TEX.R.CIV.P. 274. The charge on exemplary damages in the case sub judice is starkly different from the one in *City of Ingleside.* The *City of Ingleside* charge was silent on malice, reckless or callous disregard, or deliberate indifference.

■ But those holdings are not set out with specificity before the busy trial judge in framing the questions to be submitted to the jury. Certainly there is no objection to the "or" submission. Procedurally then, the jury was entitled to make an award based and grounded upon the acts of the former city manager. Furthermore, it must be borne in mind that the jury had to find certain acts

and conduct committed by the former city manager as forming a base of malice, reckless or callous disregard, deliberate indifference to the legal rights of the plaintiffs before the jury could award any sum of exemplary damages. No attack was launched against an award based on reckless or callous disregard, or deliberate indifference.

The jury tested the acts of the former city manager relevant to the issue of retaliation. The record is glaringly clear that on one occasion in early February 1987 the plaintiffs below were summoned to the office of the former city manager where they received certain written reprimands. But these written reprimands were not the only actions of the former city manager under the jury's scrutiny.

■ We determine that the word "malice" as used in question number seven did not have such a technical meaning or connotation that removed it from its commonly used meaning. We think the word "malice" is easily and readily understood by the average person. It did not have such a different, distinct, and technically fixed meaning in law that the average juror was not able to properly comprehend its meaning. The jury did not need a definition. Certainly the appellants proffered none. The appellants requested a special issue inquiring if the city acted towards the plaintiffs with "that amount of conscious indifference which would tend to show malice or evil intent". In that requested special issue, the appellants did not define "malice or evil intent"; impliedly, they thought no definition necessary.

■ Even so, the jury was well within its prerogative to make its award independently and based on the elements of reckless or callous disregard, or of deliberate indifference. These words or terms were not objected to. Likewise, "reckless or callous disregard" or "deliberate indifference" are words readily understood by the average person and the ordinary fact-finder.

[17] Significantly, the instruction to the jury, being an integral and triggering part of question number seven, was proper. *See and compare Sears, Roebuck & Co. v. Castillo,* 693 S.W.2d 374 (Tex.1985). Again, the

jury was within its prerogative to award exemplary damages grounded upon either reckless or callous disregard or deliberate indifference to the rights of the plaintiffs grounded upon the acts of the former city manager *or* mayor.

■ Considering the modern TEX. R.CIV.P. 277, jury question seven was correct. Rule 277 pronounces and promulgates a new philosophy of revolutionary sweep for jury questions. Rule 277 mandates:

> In all jury cases the court shall, whenever feasible, submit the cause upon broad-form questions. The court shall submit such instructions and definitions as shall be proper to enable the jury to render a verdict.

The operative words or phrases are "broad-form questions", "instructions and definitions". Manifestly then, the trial court has broad, extensive discretion in drafting questions and jury instructions. Hence, different elements of a cause of action can be provided for by instruction. *See Hill v. Robinson,* 592 S.W.2d 376 (Tex.Civ.App.—Tyler 1979, writ ref'd n.r.e.). *See and compare also Lemos v. Montez,* 680 S.W.2d 798 (Tex.1984). *See and compare Sears, Roebuck & Co., supra.* Our conclusion is that error is not shown germane to question number seven. The city requested this special issue:

### SPECIAL ISSUE NO. ____

What sum of money, if any, should be assessed against the City of Beaumont and awarded to Plaintiffs as exemplary damages?

"**Exemplary damages**" means an amount that you may in your discretion award as an example to others and as a penalty or by way of punishment, in addition to any amount that you may have found as actual damages.

Answer in dollars and cents, if any.

With respect to:

(a) Plaintiff Rush     _____
(b) Plaintiff Corder     _____
(c) Plaintiff Perricone     _____
(d) Plaintiff Parsons     _____
(e) Plaintiff Bouillion     _____

By this requested special issue, the city implied and acquiesced that exemplary damages were in the case. The city's requested special issue was not as restrictive as the one in the court's charge. Exemplary damages are recoverable under this record under the opinion of *City of Gladewater v. Pike, supra.* Harm is not shown; appellants' point of error ten is overruled.

### *Point of Error Eleven*

■ The appellants' point of error number eleven argues that there is no evidence or insufficient evidence to support the excessive award of attorneys' fees. Appellants seemingly concede that an award of attorneys' fees was properly based upon TEX.REV. CIV.STAT.ANN. art. 6252–16a, § 4(a)(4) (Vernon Supp.1993)—commonly and popularly known as the "Whistleblower Act". The appellants state that art. 6252–16a § 4(a)(4) authorizes the award of "reasonable attorney's fees". Their able brief recites: "There are no cases construing the precise meaning of this under Art. 6252–16a."

The evidence at trial on this question was the testimony of George Kirk. An exhibit on this issue was submitted. Kirk stated that initially his fees were based upon an hourly rate of from $125 to $150 per hour. His testimony was that that was the usual and customary hourly rate for these types of legal services in this area. Quickly, the hourly rate mounted up in this complex and complicated litigation to a figure that these individual officers could not pay. Again, the case was tried twice.

A contingency fee arrangement was made. Under the circumstances we cannot conclude that such an arrangement was not reasonable under the unusual history of this protracted litigation. A jury award on this question of $844,686 was later reduced by the trial court to the figure of $563,124.33. The long tradition and history in Texas is that contingent contracts are in certain circumstances not only permitted but honored. There exists a class of litigants—either poor or injured—who simply cannot pay an attorney on an hourly basis. A contingent fee arrangement is the only practical way for these litigants, who are not affluent, to obtain competent legal services.

The crucial and operative article 6252–16a meaningfully provides that a public employee may recover actual damages, exemplary damages, costs of court, reasonable attorney's fees, reinstatement (under certain circumstances), compensation for wages lost, and reinstatement of fringe benefits or seniority rights. The language of the Act contemplates a full recovery. Article 6252–16a § 4. Under the language of the Act and under the definitions of the Act, we determine, that probative evidence exists to sustain the award of the attorney's fees as set out in the final judgment. Point eleven is overruled.

### Point of Error Twelve

■ Point of error twelve declares that the Home Rule Charter of the City of Beaumont is not a law under the Whistleblower Act. We disagree. The City Charter is a compilation of the basic laws and ordinances of Beaumont. The City Charter is certainly a rule of law that was adopted under the statutes and authorities granting home rule status to Beaumont. In brief, the City Charter of Beaumont was adopted and put into effect under the aegis of legislative enactments and statutes. Hence, the City Charter is law under the Whistleblower Act. Point of error twelve is overruled.

### Appellees' Cross–Point

■ The appellees have a cross-point complaining of the trial court's action in the reduction of the attorney's fees. We determine that the trial judge acted correctly and in accordance with the testimony of Kirk and in accordance with the agreement of the attorneys for the plaintiffs and their clients. No error is shown. Appellees' cross-point number one is disallowed.

The judgment below is affirmed.

AFFIRMED.